2000 SD 132

**Leslie Tyler WATSON–WOJEWSKI,
Plaintiff and Appellee,**

v.

**Paul A. WOJEWSKI, M.D., Defendant
and Appellant.**

No. 21083.

Supreme Court of South Dakota.

Argued June 1, 2000.

Decided Oct. 11, 2000.

Linda Lea M. Viken of Viken, Viken, Pechota, Leach & Dewell, Rapid City, South Dakota, Attorneys for plaintiff and appellee.

Joseph M. Butler of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, South Dakota, Attorneys for defendant and appellant.

JAMES W. ANDERSON, Circuit Judge

[¶ 1.] Paul Wojewski appeals a circuit court order which increased his child support obligation and imposed other obligations not expressly mandated by the South Dakota child support statutes. Paul also contends that in setting child support, the circuit court erroneously excluded the potential value of his ex-wife's liquid assets from her gross income. We reverse and remand for further findings.

## FACTS

[¶ 2.] Paul Wojewski (Paul) is a successful cardiac surgeon and Leslie Tyler Watson–Wojewski (Tyler) ·is a former news anchor who currently operates a daycare business. They met and married in 1988 and had one child, John Paul. John Paul was approximately four and a half years old at the time of the modification order at issue.

[¶ 3.] Beginning in July 1996, Paul suffered a psychotic episode caused by a bipolar condition. During this time, he told Tyler he wanted a divorce, chartered a jet to California and engaged in other bizarre behavior. Paul eventually received medical treatment for his condition and his psychotic episode was brought under control in late October 1996. Since this time, Paul has consistently taken his medication and received psychological assistance to keep his bipolar condition under control.

[¶ 4.] Prior to Paul's manic episode, he was highly regarded as a surgeon and his income ranged from approximately $40,000 to $70,000 monthly. After the episode, his hospital privileges were taken away and he was unable to practice his profession for approximately one year. After treatment, he began the process of rebuilding his medical practice, earning back his reputation as a surgeon and increasing his income to his pre-illness level.

[¶ 5.] The divorce trial was held before the Honorable Merton B. Tice, Jr., on August 12 through 16, 1997. On December 12, 1997, Paul and Tyler entered into a post trial stipulation and agreement in which Tyler waived any alimony claim in exchange for a negotiated property settle-

ment. On the same date, Judge Tice signed the judgement and decree of divorce. This decree incorporated the post trial stipulation. In addition, Tyler was given primary physical custody of John Paul and Paul was granted reasonable visitation. The decree also ordered Paul to pay $2000 per month child support subject to six month reviews until Paul had reestablished his practice and his pre-illness income level.

[¶ 6.] On September 14, 1998, Tyler filed a motion for review of child support. She alleged that she had difficulty meeting the actual needs of John Paul which included a maintenance of his pre-divorce standard of living. She also argued that because Paul's income had greatly increased since the time of the original child support order, John Paul's standard of living would have likewise increased. The motion was tried before Judge Tice on January 19 and 20, 1999.

[¶ 7.] The circuit court issued its findings on Tyler's motion on May 27, 1999 and set Paul's monthly child support amount at $4,200. The court found that Paul's gross income at the time of the hearing was $74,267 a month with a child support net of $46,501.[1] The court also determined that Tyler's gross income at the time of the hearing was $2,948 per month with a child support net of $2,367.

[¶ 8.] When determining Tyler's gross income, the court included her interest and capital gain income from an individual investment account and the income from her daycare. The court did not include potential income from certain limited partnership interests.

[¶ 9.] The court also ordered payments for John Paul's education. It required Paul to pay 90 per cent of the ongoing cost of private schooling for John Paul. It also ordered Paul to deposit $400 per month into an account established exclusively for John Paul's post high school education.

[¶ 10.] Finally, the court declared that it had taken Paul's air travel costs for visitation[2] into account when setting the $4,200 per month child support award. Therefore, the court ordered Paul to pay Tyler $345 for any month he did not exercise visitation.

[¶ 11.] Additional facts will be discussed as they relate to particular issues.

[¶ 12.] Paul appeals four issues:

Whether the circuit court considered both the actual needs and standard of living of the child under SDCL 25–7–6.9 when setting child support based on a combined net income above the child support schedule?

Whether the circuit court should have included the potential income from and appreciation in value of Tyler's liquid assets when calculating her monthly net income for child support purposes under SDCL 25–7–6.3?

Whether the circuit court abused its discretion by ordering Paul to pay $400 per month into a special account to be used for John Paul's post minority college education?

Whether the circuit court abused its discretion by ordering Paul to reimburse Tyler $345 for every month he did not travel from Rapid City to Houston to visit John Paul?

## STANDARD OF REVIEW

[¶ 13.] We first note the standard of review for each issue presented. We review findings of fact under the clearly erroneous standard. To overturn the circuit court's findings, this Court must be left with a definite and firm conviction that a mistake has been made. *Billion v. Billion*, 1996 SD 101, ¶ 13, 553 N.W.2d 226, 230 (citing *Parsons v. Parsons*, 490

1. Net income for child support purposes is monthly gross income less allowable deductions under the South Dakota child support statutes. *See* SDCL 25–7–6.3 to 25–7–6.7.

2. Tyler and John Paul currently reside in Houston, Texas.

N.W.2d 733, 736 (S.D.1992) (*Parsons II*).) Questions of law are fully reviewable. *Hendricksen v. Harris*, 1999 SD 130, ¶ 7, 600 N.W.2d 180, 181.

■ [¶ 14.] This Court will not disturb a child support award unless the trial court clearly abused its discretion. *Steffens v. Peterson*, 503 N.W.2d 254, 257 (S.D.1993). Abuse of discretion is " 'a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.' " *Billion*, 1996 SD 101 at ¶ 14, 553 N.W.2d at 230 (quoting *Kanta v. Kanta*, 479 N.W.2d 505, 507 (S.D.1991)). This Court does not determine whether it would have made the ruling in question, but rather "whether a judicial mind, in view of the law and circumstances of the particular case, could reasonably have reached such a conclusion." *Id.* (citing *Nelson v. Nelson*, 454 N.W.2d 533, 534 (S.D.1990)).

## DECISION

### ISSUE ONE

[¶ 15.] **Whether the circuit court considered both the actual needs and standard of living of the child under SDCL 25–7–6.9 when setting child support based on a combined net income above the child support schedule?**

■ [¶ 16.] Paul argues that the monthly $4,200 child support award was excessive under the evidence and applicable law.[3] Paul claims that: (1) the circuit court considered expenses which related solely to Tyler's needs; and (2) the circuit court failed to consider the actual needs of the child as required by SDCL 25–7–6.9.[4]

Paul asserts, therefore, that part of the child support award must be either de facto alimony or a pre-distribution of Paul's estate.

■ [¶ 17.] In order to address these contentions, we must look to the circuit court's findings of fact on the child support calculation. A main purpose of such findings is "to aid the appellate court in reviewing the basis for the trial court's decision[.]" *Heikkila v. Carver*, 416 N.W.2d 591, 592 (S.D.1987) (citing J. Moore & J. Lucas, 5A *Moore's Federal Practice*, ¶ 52.06[1] (1987) and C. Wright & A. Miller, 9 *Federal Practice and Procedure* § 2571 (1971)). Therefore, "[i]t is for the trial court to make adequate findings to enable us to make a meaningful review." *Jensen v. Weyrens*, 474 N.W.2d 261, 266 (S.D.1991) (Sabers, J., concurring in part and dissenting in part). In child support cases, we must have sufficient findings of fact to "make the appropriate calculations and render a meaningful review[.]" *Grunewaldt v. Bisson*, 494 N.W.2d 193, 195 (S.D.1992).[5]

[¶ 18.] In this case, there were very limited findings on the child support calculation. The circuit court found that Paul's child support net was $46,501 per month and that Tyler's child support net was $2,367 per month. The court also concluded that "the proportion of the parents' child support income is 90% for [Paul] and 10% for [Tyler]." In addition, the court mentioned Tyler's budget, which showed monthly expenses over $14,000, but it did

---

3. Paul pointed out in oral argument that his monthly child support obligation is actually closer to $6,000 per month ($4,200, $400 college fund, $375 missed visitation charge, $600 private schooling, and approximately $1000 in counseling charges). Paul has not appealed the private schooling payment or counseling charges and we will address the college fund and missed visitation payment separately. Therefore, we address only the $4,200 child support award here.

4. "For a combined net income above the schedule in § 25–7–6.2, the child support obligation shall be established at an appropriate level, taking into account the actual needs and standard of living of the child." SDCL 25–7–6.9.

5. Although our decision in *Grunewaldt* addressed a child support award under the schedule, our reasoning is equally applicable to incomes above the schedule. We must be able to follow the circuit judge's reasoning for setting the specific child support amount.

not make specific findings about which of these budget items were allowed.

[¶ 19.] These limited findings do not illustrate how the circuit court calculated the $4,200 per month child support award. Therefore, we are unable to "make the appropriate calculations and render a meaningful review." *Id.* As a result, we must reverse and remand to the circuit court for sufficient findings on the child support figure to allow us meaningful review of Paul's contentions. *See Grode v. Grode*, 1996 SD 15, ¶ 29, 543 N.W.2d 795, 803 (failure to make adequate findings constitutes reversible error).

[¶ 20.] After reviewing Tyler's budget, however, we are compelled to provide some guidance to the circuit court on remand. The first point of guidance concerns any items of Tyler's budget which relate solely to her needs. Under SDCL 25–7–6.9, the trial court is to establish child support "at an appropriate level, taking into account the actual needs and standard of living *of the child.*" SDCL 25–7–6.9 (emphasis added). The custodial parent has the burden of proving his or her claimed expenses reflect the *child's* needs and standard of living. *Ochs v. Nelson*, 538 N.W.2d 527, 530 (S.D.1995) (citing *Jones v. Jones*, 472 N.W.2d 782, 785 (S.D. 1991)).

[¶ 21.] In regard to this test, we have stated that "[t]he indirect financial benefit a custodial spouse receives cannot serve as a justification for denial of support to children whose actual needs and standard of living warrant a particular award." *Billion*, 1996 SD 101 at ¶ 44, 553 N.W.2d at 236. However, SDCL 25–7–6.9 does not authorize "an alimony/palimony windfall contained in the rhetoric of child support." *Ochs*, 538 N.W.2d at 533 (Amundson, J., concurring in part and dissenting in part).

[¶ 22.] Clearly, Tyler will get an indirect benefit from any child support award to John Paul. What is troubling, however, is Tyler's admission at the modification hearing that she made no attempt whatsoever to allocate expenses between herself and John Paul. This testimony indicates that her budget likely contains some figures which were expended strictly for her own needs.[6] Therefore, the circuit court must make specific findings on Tyler's budget items on remand and disallow any expense which Tyler has not proven necessary for *John Paul's* actual needs and standard of living.[7]

[¶ 23.] The second point of guidance is that the circuit court must consider *both* the actual needs and standard of living of John Paul. Although the circuit court mentioned both actual needs and standard of living in its findings, it failed to enter specific findings on either of these factors.

[¶ 24.] The court need not enter specific findings on actual needs and standard of living if proof of both exists. *Bloom v. Bloom*, 498 N.W.2d 213, 217 (S.D.1993) (citing *Jones*, 472 N.W.2d at 785). However, Tyler did not present evidence of the actual needs of John Paul at the modification hearing, only his standard of living. For example, Tyler borrowed some funds from her parents to maintain her standard of living. She also clearly admitted that her budget was based on the pre-divorce standard of living of she and John Paul, not her actual expenditures. In fact, there was little evidence of the actual *needs* of John Paul between the first support order and the modification hearing.

[¶ 25.] Because such evidence of actual needs was lacking, the circuit court was

---

6.   We leave it to the circuit court to determine which items, if any, on remand.

7.   At one point, Tyler had a motion before the circuit court for reconsideration of alimony. However, she seems to have dropped this motion at the child support modification hearing. Tyler cannot now use child support as a back door to alimony.

not excused from making findings on actual needs under *Jones.* Therefore, the court must make findings on both John Paul's actual needs and standard of living on remand.

[¶ 26.] In summary, we reverse the circuit court's $4,200 monthly child support order. We remand for the circuit court to make specific findings on its calculation of the monthly child support figure. In making these findings, the court should not consider any items of Tyler's budget relating solely to her own needs. Moreover, the court should make specific findings on both John Paul's actual needs and standard of living.

### ISSUE TWO

[¶ 27.] **Whether the circuit court should have included the potential income from Tyler's liquid assets when calculating her monthly net income for child support purposes under SDCL 25–7–6.3?**

[¶ 28.] Paul claims that the circuit court inappropriately excluded from Tyler's gross income the potential income from Tyler's personal investment account, Northern Trust, and her limited partnerships, Watfield Ltd. and 56585963 Ltd. As such, he argues that Tyler's child support net income must be recalculated on remand.

■ [¶ 29.] The first question is whether the limited partnerships' tax reportable income should have been included in Tyler's gross income. At the hearing, Tyler presented expert testimony that although her tax return showed income from the limited partnerships, these funds remained in the partnerships. The circuit court found that "although [Tyler] shows 'income' from the partnership on her tax return, [there] are no actual dollars coming to her, but tax reportable income only." As a result, the court did not consider the limited partnership income when setting Tyler's child support net income at $2,367 per month.

[¶ 30.] One definition of gross income in the South Dakota child support statutes provides that:

> Gross income from a business, profession, farming, rentals, royalties, estates, trusts *or other sources,* are the net profits or gain, or net losses shown on any or all schedules filed as part of the parents' federal income tax returns[.]

SDCL 25–7–6.6 (emphasis added). The income reported on the limited partnership tax returns fits within the other sources listed in SDCL 25–7–6.6. Regardless of whether Tyler actually received this partnership income, it was nevertheless "net profits or gain ... filed as part of [her] federal income tax returns." *Id.* Hence, it was part of her gross income.

[¶ 31.] This reading is consistent with our treatment of corporate retained earnings; such earnings are gross income under SDCL 25–7–6.6. *Ochs,* 538 N.W.2d at 529. In *Ochs,* these earnings were described as follows:

> An accountant testified that retained earnings *will not translate into an equivalent amount of cash* and the company needs these earnings to maintain growth. The company's banker verified that due to company debt, *it had agreed not to draw out its retained earnings.* On the other hand, Robert borrowed $79,600 from the company, for which there had been no repayment made in over three years. These conflicting matters were factual issues for the trial court to unravel.[8] *Robert fails to show why retained earnings from a closely held corporation do not fall within the*

---

8. Tyler claims that we added retained earnings to the father's gross income in *Ochs* only because he had already borrowed almost $80,000 of these earnings. However, in at least one of the cases cited by this Court in support of its holding, there was no indication that the parent had withdrawn any of the retained earnings. *See Merrill v. Merrill,* 587 N.E.2d 188 (Ind.Ct.App.1992). Therefore, the holding in *Ochs* is not tied to the fact that the father had already taken out some of the earnings in the form of loans.

*ambit of this statute.* Other jurisdictions have similarly found it appropriate to consider corporate retained earnings as income for the purposes of calculating child support.

*Id.* (emphasis and footnote added)

[¶ 32.] This description of corporate retained earnings and Tyler's description of the limited partnership income are quite similar. Both entities hold onto earnings and reinvest them into the entity. Both entities must report these earnings on their tax return. Neither entity pays these earnings as cash. If retained earnings are income for child support purposes, then the earnings from Tyler's limited partnership interests are also income. As a result, the circuit court should have considered the income from Tyler's family limited partnerships as part of her gross income. This Court orders the circuit court on remand to include in Tyler's gross income any profits from the limited partnerships shown on her tax return.

[¶ 33.] Having addressed the first question under issue two, whether the limited partnership income should have been part of Tyler's gross income, we turn to the second question: whether Tyler's capital accounts[9] in the limited partnerships should be considered part of her gross income.

[¶ 34.] The relevant statute provides that:

The monthly gross income of each parent includes *amounts received* from the following sources:

* * *

(4) Interest, dividends, rentals, royalties or other gain derived from investment of capital assets[.]

SDCL 25–7–6.3 (emphasis added). We read this provision to include a capital account received from a limited partnership.

[¶ 35.] The real question, then, is whether Tyler can actually receive her capital account. According to the limited partnership agreements:

The General Partner may, and if there is more than one General Partner then they may, *by unanimous decision of all the General Partners, return capital contributions* or allocate net profits to the partners. . . . No partner shall be entitled to withdraw or demand the return of any part of his or her capital account except upon dissolution or winding up of the partnership *and as specifically provided for in this Agreement.* (emphasis added).

As can be seen from this language, a limited partner can usually receive his or her capital account only after dissolution and winding up of the partnership. However, this agreement specifically provides that Tyler can access her capital contributions if all the general partners agree.

[¶ 36.] In an affidavit, Tyler's sister Terri Watson states that Terri is the general partner of Watfield Ltd. and that Tyler has unilateral access to her individual account in Watfield Ltd. This evidence is sufficient to warrant findings of fact on whether Tyler's capital account in Watfield Ltd. is available to her under SDCL 25–7–6.3 and therefore part of her gross income. On remand, the circuit court should make findings of fact on the accessibility of Tyler's capital contributions in Watfield Ltd.[10]

[¶ 37.] The final question is whether the circuit court should have considered the investment potential of Tyler's individual account with Northern Trust. Paul

---

9. Tyler points out that the original contributions to the partnerships were a gift from her mother. While this fact might have some relevance to property division, we fail to see its relevance for child support purposes.

10. Paul has directed this Court to no evidence that the capital account in the other partnership, 56585963 Ltd., was available to Tyler. Therefore, the circuit court need not consider Tyler's capital account in 56585963 Ltd. on remand.

claims that the circuit court erred by considering only the actual income of this investment. He argues that because Tyler controls the investment mix and, hence, the income, the court should have considered what the account would have made if conservatively invested.

■ [¶ 38.] We need not address the merits of this issue. Although Paul proposed *findings* on several investment possibilities for Tyler's individual account, he did not present *evidence* of these investment possibilities at the modification hearing.[11] Findings of fact must be based on evidence in the record. *Nelson v. State Bd. of Dentistry*, 464 N.W.2d 621, 625 (S.D.1991); *Farmers Union Coop. v. Schladweiler Bros.*, 448 N.W.2d 650, 653–54 (S.D.1989); *Sanborn v. Farmers Union Elevator Co.*, 68 S.D. 138, 299 N.W. 258, 259 (S.D.1941). Therefore, because Paul presented no evidence of investment possibilities at the modification hearing, he waived any findings on this issue.

[¶ 39.] On remand, we direct the circuit court to include Tyler's tax reportable limited partnership income when setting her gross income. We also direct the circuit court to make findings on whether Tyler's capital account in Watfield Ltd. is accessible to her.

## ISSUE THREE

[¶ 40.] **Whether the circuit court abused its discretion by ordering Paul to pay $400 per month into a special account to be used for John Paul's post minority college education?**

■ [¶ 41.] The third issue is whether the circuit court abused its discretion when it ordered Paul to pay $400 per month into

a post minority college education account. Resolution of this issue turns on SDCL 25–5–18.1:

> The parents of any child are under a legal duty to support their child in accordance with the provisions of § 25–7–6.1, *until the child attains the age of eighteen, or until the child attains the age of nineteen* if he is a full-time student in a secondary school. (emphasis added).

[¶ 42.] This Court has interpreted SDCL 25–5–18.1 as follows:

> The statute simply does not provide the trial court with the authority or discretion to extend the application of the statute beyond the age of nineteen.... We cannot extend a statute where its plain language dictates the result.
>
> We hold that *where the parties do not otherwise agree ... the trial court may not impose a duty to support beyond nineteen.*

*Birchfield v. Birchfield*, 417 N.W.2d 891, 895 (S.D.1988) (citations omitted) (emphasis added). Therefore, the ongoing college fund is authorized *only* if Paul has agreed to pay for John Paul's college education.[12]

[¶ 43.] The agreement in this case provided that Paul would "in good faith provide for a college education for John Paul *to the best of his ability at that time.*" (emphasis added). According to the plain language of this stipulation, Paul has agreed to provide for John Paul's college education if, and only if, Paul is financially able to do so *at the time John Paul reaches college age.* Paul has not agreed to pay *now.* If Tyler wanted a higher education guarantee from Paul, she should have specifically negotiated for it in the post trial stipulation.[13]

---

11. Paul introduced exhibits at the modification hearing on the historical growth of Tyler's individual account. However, he presented no specific evidence of what Tyler's investments could earn if invested in particular securities at a particular rate of return. Such evidence first appeared in Paul's proposed findings after the modification hearing.

12. Tyler claims that SDCL 25–4–45 authorizes the monthly payment. However, that statute simply authorizes the circuit court to give direction for education of the children in an action for divorce. It does not extend to conflict with the support ceiling of SDCL 25–5–18.1.

13. Although requiring an ongoing higher education fund in a case such as this might be

[¶ 44.] In summary, SDCL 25–5–18.1 does not authorize an ongoing higher education fund as part of a child support award unless the parties so agree. Because Paul did not agree to the ongoing fund, the circuit court abused its discretion. We therefore reverse on this issue.

## ISSUE FOUR

[¶ 45.] **Whether the circuit court abused its discretion by ordering Paul to reimburse Tyler $345 for every month he did not travel from Rapid City to Houston to visit John Paul?**

[¶ 46.] Paul claims that the circuit court abused its discretion by ordering him to pay Tyler a penalty for every month he failed to fly to Houston to visit John Paul. Judge Tice's reasoning for this order was as follows:

> [T]his Court having considered the cost of air travel of [Paul] for visitation purposes when setting the foregoing support,[14] should there be any month in which [Paul] does not exercise visitation of John Paul, he shall pay to [Tyler] an additional sum of $345 to be included along with the child support payment for the succeeding month. This amount shall be considered child support. (footnote added).

[¶ 47.] The circuit court has statutory authority to allocate travel costs between the parties:

> If travel costs are substantial due to the distance between the parents, the court may order the allocation of such costs, taking into consideration the circumstances of the respective parties as well as which parent moved and the reason that the move was made.

equitable, it is not authorized by SDCL 25–5–18.1. Such authorization would have to come from the legislature, not this Court.

14. Due to the lack of findings on the child support calculation, we cannot determine

SDCL 25–7–6.15. However, the intermingling of travel costs with the actual child support figure, as was done in this case, gives the appearance of a penalty for nonvisitation. This situation should be avoided. *See Hathcock v. Hathcock,* 685 So.2d 736, 738 (Ala.Civ.App.1996) (Penalty for nonvisitation disallowed). Therefore, the allocation of travel costs under SDCL 25–7–6.15 shall be separate and distinct from the monthly child support award.

[¶ 48.] Based upon the foregoing, we hold that the circuit court abused its discretion by requiring Paul to pay $345 for every month he did not fly to Houston to visit John Paul and we reverse on this issue. If the circuit court again allocates travel costs on remand, it must separate this allocation from the monthly child support amount.

[¶ 49.] Reversed and remanded for proceedings consistent with this opinion and for further findings.

[¶ 50.] SABERS, and AMUNDSON, and GILBERTSON, Justices, and FLEMMER, Circuit Judge, concur.

[¶ 51.] JAMES W. ANDERSON, Circuit Judge, for MILLER, Chief Justice, disqualified.

[¶ 52.] FLEMMER, Circuit Judge, for KONENKAMP, Justice, disqualified.

where this allocation was made. However, this lack of factual findings is not important to our decision on this issue.